UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

CAROL COBRANDO,

      Plaintiff,

v.                Case No.  5:07-cv-363-Oc-GRJ

MICHAEL J. ASTRUE, Commissioner of Social
Security,

      Defendant.
_____/

## ORDER

Plaintiff appeals from a final decision of the Commissioner of Social Security ("the Commissioner") denying his application for a period of disability and disability insurance benefits and supplemental security income. (Doc. 1.)  The Commissioner has answered (Doc. 10), and both parties have filed briefs outlining their respective positions. (Docs. 16 & 17.)  For the reasons discussed below, the Commissioner's decision is due to be **REVERSED and REMANDED**.

### I.  PROCEDURAL HISTORY

Plaintiff filed an application for a period of disability, disability insurance and supplemental security income benefits on December 2, 2004, and November 30, 2004, respectively.  (R. 82-89.)  Plaintiff alleged disability beginning November 30, 2004.  (R. 82.) Plaintiff's application was denied initially (R. 24-27, 43-45), and upon reconsideration. (R. 28-31, 46-47.)  Thereafter, Plaintiff timely pursued her administrative remedies available before the Commissioner, and requested a hearing before an Administrative Law Judge ("ALJ"). (R. 50.)  The ALJ conducted an

administrative hearing on August 8, 2006. (R. 315-338.)  On November 22, 2006, the ALJ issued an unfavorable decision to Plaintiff. (R. 15-21.)  The Appeals Council denied Plaintiff's request for review on July 6, 2007. (R. 5-7.)   Plaintiff then timely filed her Complaint challenging the decision of the Commissioner.

## II. **STANDARD OF REVIEW**

The Commissioner's findings of fact are conclusive if supported by substantial evidence.[1]  Substantial evidence is more than a scintilla, i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.[2]

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.[3] The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.[4] However, the district court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient

---

[1] *See* 42 U.S.C. § 405(g).

[2] Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Richardson v. Perales, 402 U.S. 389, 401, (1971); Walden v. Schweiker, *accord* Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

[3] Edwards, 937 F.2d at 584 n.3; Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).

[4] Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995); *accord* Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding that the court also must consider evidence detracting from evidence on which the Commissioner relied).

reasoning to determine that the Commissioner properly applied the law.[5]   The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[6]  The impairment must be severe, making Plaintiff unable to do her previous work, or any other substantial gainful activity which exists in the national economy.[7]

The ALJ must follow five steps in evaluating a claim of disability.[8]  First, if a claimant is working at a substantial gainful activity, she is not disabled.[9] Second, if a claimant does not have any impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled.[10] Third, if a claimant's impairments meet or equal an impairment listed in Title 20, Part 404, Subpart P, Appendix 1 of the Code of Federal Regulations, she is disabled.[11] Fourth, if a claimant's impairments do

---

[5] Keeton v. Dep't Health & Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

[6] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505.

[7] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-1511.

[8] 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[9] 20 C.F.R. § 404.1520(b).

[10] Id. at § 404.1520(c).

[11] Id. at § 404.1520(d).

not prevent her from doing past relevant work, she is not disabled.[12] Fifth, if a claimant's impairments (considering her residual functional capacity ("RFC"), age, education, and past work) prevent her from doing other work that exists in the national economy, then she is disabled.[13]

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff.[14] The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently exists in the national economy.[15] The Commissioner may satisfy this burden by pointing to the grids for a conclusive determination that a claimant is disabled or not disabled.[16]

However, the ALJ should not exclusively rely on the grids when the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of exertion.[17] In a situation where both exertional and non-exertional impairments are

---

[12] Id. at § 404.1520(e).

[13] 20 C.F.R. § 404.1520(f).

[14] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987); see also Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001).

[15] Doughty, 245 F.3d at 1278 n.2. In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform. In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations. Id. (citations omitted).

[16] Walker, 826 F.2d at 1002 "[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work.").

[17] Phillips v. Barnhart, 357 F.3d 1232, 1243 (11th Cir. 2004); Wolfe v. Chater, 86 F.3d 1072, 1077 (11th Cir. 1996); Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Walker v. Bowen, 826 F.2d 996, 1003 (11th Cir. 1987)("[T]he grids may be used only when each variable on the appropriate grid accurately
(continued...)

found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[18]

The ALJ may use the grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[19] Such independent evidence may be introduced by a vocational expert's testimony, but this is not the exclusive means of introducing such evidence.[20] Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.[21]

### III. **SUMMARY OF THE RECORD EVIDENCE**

Plaintiff was 43 years old at the time the ALJ issued his decision.  (R. 85.) Plaintiff has a high school general equivalency diploma and past relevant work as a janitor, waitress, housekeeper, assembler, and deli worker. (R.106-07,111,113.) Plaintiff contends that she has been unable to work since November 30, 2004, due to Lyme disease, fibromyalgia, fatigue, hypertension, and depression.  (R. 85, 104-12, 121-24, 128-37, 141-63.)

---

[17](...continued)
describes the claimant's situation.").

[18] Walker, 826 F.2d at 1003.

[19] Wolfe, 86 F.3d at 1077-78.

[20] *See* id.

[21] *See* Doughty v. Apfel, 245 F.3d 1274, 1278 n.2 (11th Cir. 2001).

5

Although the ALJ declined to find depression as a severe impairment, the ALJ did determine that Plaintiff suffered from severe impairments of fibromyalgia, Lyme disease, irritable bowl syndrome, high blood pressure, and arthritis.  (R. 17.)  Although the ALJ evaluated the record regarding a possible mental impairment, after a full recitation of Plaintiff's medical history, the ALJ declined to find Plaintiff's depression severe.  (R. 20.)

While the ALJ determined that Plaintiff had severe impairments, the ALJ determined that Plaintiff did not have an impairment or combination of impairments which met or medically equaled one of the impairments listed in Appendix 1, Subpart P of Social Security Regulation No. 4.   (R. 19.)

The ALJ then found that Plaintiff retained the RFC to perform a significant range of light work.  (R. 19-20.)  The ALJ determined that Plaintiff could lift and/or carry up to 10 pounds frequently and up to 20 pounds occasionally; and that she could sit, stand and/or walk for approximately six hours in an eight hour workday.  (R. 19.)  The ALJ stated that Plaintiff's RFC did not preclude the performance of her past relevant work as a waitress, assembly worker, hotel cleaner/housekeeper and concluded that Plaintiff was not disabled.  (R. 20-21.)

Plaintiff received treatment with Little River Medical Center and Dr. William O'Connor from October of 2003 until December of 2004.  (R. 176-200.)  During this time frame, Plaintiff was treated for hypertension (R. 186, 188), hyperlipidemia, (R. 186, 188, 192), bronchitis (R. 193), Lyme disease (R. 188,190), gynecological care (R. 190), fibromyalgia (R. 189), arthralgias (R. 190) and depression (R. 194.)

On August 2, 2004, Plaintiff presented to Dr. O'Connor for a follow-up visit. (R. 194.) Plaintiff complained that she "lost it" the previous weekend and had a four hour period of uncontrollable crying. (R. 194.) Also according to Plaintiff, she had "long-standing depression for which she has been treated with Prozac for approximately 9 years on and off." (Id.) Additionally, Plaintiff reported that she experienced sadness, sleep disturbance, anhedonia, mood lability, loss of energy, and a change in appetite. According to Dr. O'Connor, Plaintiff has a history of going on and off her medicines at will. Dr. O'Connor diagnosed Plaintiff with depression, personality disorder, and bronchitis. Dr. O'Connor prescribed Prozac and referred her to Debra Klick, a certified master social worker.

On August 6, 2004, Plaintiff was treated by Debra Klick. (R. 195.) In that evaluation, Plaintiff reported that she was tearful, remorseful, sad, frustrated, and angry and that she had recently been restarted on Prozac because of an inability to function. Although Ms. Klick observed Plaintiff to be jumpy and tearful, Plaintiff was able to calm herself. According to Ms. Klick, that session focused upon teaching Plaintiff relaxation techniques. Ms. Klick suggested cognitive/behavioral therapy to help Plaintiff focus on self-care and making better decisions.

Plaintiff saw Ms. Klick again on August 13, 2004. (R. 196.) During this appointment, Ms. Klick noted that Plaintiff was feeling better but had done little for self-care. Ms. Klick noted that Plaintiff was able to identify a self-improvement plan to seek stable employment. Ms. Klick noted that Plaintiff's mood was brighter and her resilience had returned. In the December 2004 session, Ms. Klick reported that Plaintiff was capable of insight but that she needed constant redirection. (R. 198.)

Plaintiff returned to Little River Medical Center on November 12, 2004 complaining of aches all over.  (R. 197.)  Plaintiff frequently cried during this interview.  Dr. Clyde Dellinger noted that Plaintiff's joint pain was more reminiscent of fibromyalgia than Lyme disease.  At her appointment in December, Plaintiff complained of difficulty sleeping, a depressed mood, anhedonia, and mood lability.  (R. 199.) As a result, her Prozac was increased and she reported that her sleep disturbances had improved.

On December 27, 2004, Plaintiff attended a treatment session with Ms. Klick.  (R. 200.)  At this session, Plaintiff's mood was stable; however, a month later, Plaintiff presented as restless, hyper-verbal, scattered, and irritable.  Plaintiff explained that the onset of these symptoms corresponded to an increase in her Prozac medication.  Consequently, Plaintiff's medication was reduced.

On February 28, 2005, Plaintiff underwent a consultative psychological evaluation with Dr. Gary Honickman, Ph.D.  (R. 201-202.)  Dr. Honickman found Plaintiff oriented in all spheres with good insight and judgment.  (R. 201.)  Plaintiff complained to Dr. Honickman that she felt depressed and was often fatigued and that despite her medications she had difficulty falling asleep. (R. 202.)  However, Plaintiff denied suicidal thoughts or hallucinations. (R. 201.) Dr. Honickman noted that Plaintiff could recall seven digits forward and five backward and she correctly interpreted one of two abstract proverbs.

During this appointment, Plaintiff described her activities of daily living, which included waking up, eating breakfast, visiting with her mother, eating lunch, watching television, taking a walk, eating dinner and watching a movie in the evening.  (R. 202.)  Plaintiff reported that she is also able to cook and shop.  Dr. Honickman diagnosed

Plaintiff with Dysthymic[22] disorder but found her capable of managing any funds to which she may be entitled.

On March 1, 2005, Plaintiff underwent a consultative physical examination by Dr. Edward Demmi.  (R. 203-207.)  Plaintiff's motor, sensory, and reflex findings were normal as was her gait, but Dr. Demmi did note that Plaintiff had difficulty with heel to toe testing and exhibited tenderness to palpation in the shoulders, elbows, knees, and ankles. (R. 205-207.)  Dr. Demmi noted that Plaintiff's range of motion was normal in the cervical and lumbar spine.  Although Plaintiff described herself as feeling depressed, Dr. Demmi found Plaintiff alert and oriented times three and her affect, mood and intellectual functioning were normal.  (R. 206.)  Plaintiff commented that normally she takes Prozac but she was currently out of her medications.  Dr. Demmi diagnosed Plaintiff with Lyme disease with associated arthralgias and fibromyalgia.  (R. 206.)

On April 13, 2005, Dr. Mark Williams, a state agency psychologist, reviewed Plaintiff's medical records.  (R. 217-230.)  Dr. Williams concluded that Plaintiff did not have a severe mental impairment but did suffer from Dysthmia disorder.  (R. 217.)  In support of this conclusion, he noted that Prozac and Trazadone controlled her depressed mood and sleep disturbances.  (R. 229.)  Additionally, Dr. Williams referenced the consultative evaluation which noted no signs, findings or reports of a history of mental illness.  Dr. Williams opined that Plaintiff's degree of limitations were

---

[22] Dysthmia" is characterized by at least 2 years of depressed mood for more days than not, accompanied by additional depressive symptoms that do not meet criteria for a [m]ajor [d]epressive [e]pisode."  AM. PSYCHIATRIC ASS'N. DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 345 (4th ed. 2000).

mild restrictions of activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence or pace and no episodes of decompensation. (R. 227.)

On May 1, 2005, Dr. J. Vergo Attlesey, a state agency physician, reviewed the medical record and conducted a RFC assessment. (R. 209-216.) Dr. Attlesey concluded that Plaintiff could perform light work. More specifically, he found that Plaintiff could lift and carry up to 20 pounds occasionally; she could sit or stand/walk up to six hours in an eight hour day; could occasionally climb ramps or stairs, balance, stoop, kneel, crouch and crawl, but could never climb ladders, or scaffolds. (R. 210-211.) Finally, Dr. Attlesey concluded that Plaintiff should avoid concentrated exposure to extreme cold or heat, fumes, or work hazards. (R. 213.)

Plaintiff underwent medical treatment for fibromyalgia, hypertension, Lyme disese, gynecological care, and irritable bowel syndrome, from May 23, 2005 to March 16, 2006, at the Florida Department of Health. (R. 231-268, 292-299.) During a visit on May 23, 2005, Plaintiff was tearful. (R. 238) However, on the next follow up visit, Plaintiff reported that her mood had improved. (R. 236.) In June of 2005, Plaintiff was referred for a cat scan of the neck and chest, which revealed small scattered lymph nodes within the soft tissues of the neck and mediastinum, although these were not enlarged by CT criteria. (R. 291.)

On July of 2005, Dr. Nicholas Banks, a state agency physician reviewed the medical  records and conducted a second residual functional capacity assessment. (R. 269-276.) Dr. Banks found that Plaintiff could lift and carry up to 20 pounds occasionally and 10 pounds frequently; she could sit or stand/walk up to six hours in an

eight hour day; she had an unlimited ability to push or pull; could occasionally climb ramps or stairs, balance, stoop, kneel, crouch and crawl, but could never climb ladders, rope, or scaffolds. (R. 271.) Further, Dr. Banks concluded that Plaintiff should avoid concentrated exposure to extreme cold or heat, or hazards. (R. 273.) Finally, Dr. Banks highlighted that Plaintiff's activities of daily living included, self-care, housework and shopping. (R. 270.)

On July 18, 2005, Dr. Alan J. Harris, Ph.D, a state agency psychologist, conducted a second psychological review. (R. 277-290.) Dr. Harris found a medically determinable impairment of Dysthymic disease existed, but determined that it was not severe. (R. 277, 280.) Dr. Harris concluded that Plaintiff had no restrictions in her activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence or pace and no episodes of decompensation. (R. 287.) Dr. Harris points out that although Plaintiff claims to have suffered depression for years, that assertion is not supported by the evidence. (R. 289.) In Dr. Harris' opinion, other than sadness, Plaintiff's cognitive functioning is in tact, her activities of daily living only indicate physical limitations, and she is within normal limits.

On July 20, 2005, Plaintiff presented to Marion Citrus Mental Health for an evaluation of her depression. (R. 248-55.) During the evaluation, Plaintiff spoke clearly, she denied suicidal or homicidal ideations, and her sensorial and motor skills were in tact. (R. 253.) The evaluator noted that Plaintiff was oriented times three; however, Plaintiff had difficulty concentrating and her mood was sad. Although, Plaintiff had immature insights, the evaluator found that she could be easily guided in therapy and recommended counseling.

11

On June 27, 2006, Plaintiff returned to Marion Health Center for complaints of major depression. (R. 300-312.) During the biopsychosocial assessment, Plaintiff appeared depressed, sad, and tearful, but did not have auditory or visual hallucinations and was oriented to person, place, and time. (R. 301.) Plaintiff reported that she had poor insight and concentration, was irrational and had low energy. The examiner noted that Plaintiff was able to express her feelings, was motivated for treatment and was capable of independent living. (R. 310.) Plaintiff was diagnosed with a major depressive disorder and was assessed a GAF score of 55, which is representative of an individual with moderate symptoms or with moderate difficult in social, occupational, or school functioning. Plaintiff was discharged and it was recommended that she proceed with a counseling. (R. 306.)

On August 6, 2006, Plaintiff testified at the administrative hearing. (R. 315-338.) During the course of this hearing, Plaintiff stated that she was extremely depressed (R. 325) and experienced mood swings, uncontrollable crying twice daily, and that her sadness never stops. (R. 329.) However, she also reported that she has the ability to drive (R. 324), go grocery shopping (R. 328), and enjoy dining out with her boyfriend. (R. 331.) Although she testified that the depression effects her concentration, Plaintiff stated that she was able to concentrate on television shows and reading a book. (R. 330) Plaintiff stated that medication helps her to fall asleep and that she sleeps five good hours a night. (R. 332, 334.) Lastly, Plaintiff reported that she had just began counseling for her depression. (R. 336.)

## IV. **DISCUSSION**

Plaintiff raises one issue on appeal. Plaintiff argues that the ALJ committed reversible error at step two by not finding Plaintiff's depression to be a severe impairment. The Court agrees.

At the second step of the sequential disability determination, the ALJ must "consider the medical severity of [the claimant's] impairments."[23] In doing so, the ALJ must determine whether the impairments, alone or in combination, "significantly limit" the claimant's "physical or mental ability to do basic work skills."[24] This is a threshold inquiry and only claims based on the most trivial impairments are rejected.[25] "An impairment is not severe only if the abnormality is so slight and its effect so minimal that it would clearly not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience."[26] A diagnosis is, however, insufficient. Instead, Plaintiff must show the effect of the impairment on her ability to work.[27] In other words, the severity of a medically ascertained impairment must be measured in terms of its effect upon ability to work, and not simply in terms of deviation from purely medical standards of bodily perfection or normality.[28]

---

[23] *See* Wind v. Barnhart, 133 Fed.Appx. 684, 690 (11th Cir. 2005)(*quoting* Phillips v. Barnhart, 357 F.3d. 1232, 1237 (11th Cir. 2004).

[24] *See* id.

[25] *See* McDaniel v. Bowen, 800 F.2d 1026, 1031 (11th Cir. 1986).

[26] Id.

[27] *See* Wind, 133 Fed.Appx. at 690 (quoting McCruter v. Bowen, 791 F.2d 1544, 1547 (11th Cir. 1986).

[28] McCruter v. Bowen, 791 F.2d 1544, 1547 (11th Cir. 1986).

In order to establish that a mental impairment is severe a claimant must show that the mental impairment significantly limits a claimant's abilities to do basic work activities. Basic work activities include:  (1) physical functions such as walking, standing, sitting, lifting, pushing; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) using judgment; (5) responding appropriately to supervision, co-workers and usual work situations; and (6) dealing with changes in a routine work setting.[29] In addition, in order to be considered a severe impairment, the impairment must last for a continual period of at least twelve months.[30]

The claimant points to the following medical evidence in support of her argument that her depression had at least a minimal effect on her general ability to work so that it should have been considered a severe impairment to pass step two muster: (1) notes from an in-patient admission to the Marion Citrus Mental Health Center, Inc. containing a diagnosis of major depressive disorder and a GAF (Global Adaptive Functioning) assessment of 55 on June 27, 2006; and (2) the diagnostic impression of Dysthmic disorder given by Gary Honickman, Ph.D., a consultative psychologist, on February 8, 2005.  The ALJ primarily relied upon the opinions from the state agency physicians in concluding that Plaintiff experienced mild limitations due to depression and did not have a severe impairment. While the ALJ stated that his conclusion was "generally consistent" with Dr. Honickman's report, he failed to explain how or in what manner it was consistent

---

[29] 20 C.F.R. §§ 404.1521(b), 416.921(b).

[30] 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. §§ 404.1505(a), 404.1509, 404.1520(c), 416.905(a), 416.909, 416.920(c); see also, Barnhart v. Walton, 535 U.S. 212 (2002)(noting that a claimant's impairment(s) must last for at least twelve months).

with the mental status examination or with Dr. Honickman's diagnostic impression of Dysthmic disorder.

With regard to the June 27, 2006 in-patient admission and evaluation at the Marion Citrus Mental Health Center, while the ALJ mentions that Plaintiff was admitted for evaluation, the ALJ failed to mention, discuss or consider that Plaintiff was diagnosed with a major depressive disorder and was assigned a GAF of 55. A GAF of 55 is consistent with moderate (and not mild) symptoms or with moderate difficulty (and not mild difficulty) in social, occupational or school functioning.[31] While moderate limitations might not have had a significant impact on the Plaintiff's residual functional capacity that is a determination the ALJ should have made at step four of the sequential analysis. At step two of the sequential evaluation the analysis is only a threshold determination that the impairment has some minimal effect on the ability to engage in basic work activities. As mentioned above, a GAF of 55 means there is more than a minimal effect on occupational functioning. As such, the ALJ should have assessed the significance of this evidence in determining at step two whether the impairment of major depressive disorder had a minimal effect on the ability to work. Because the ALJ failed to do so, the Commissioner's decision is due to be reversed.

The ALJ's decision with regard to his assessment of the report of Dr. Honickman is also highly problematic. The results of the mental status evaluation by Dr. Honickman note that Plaintiff reported depression for years and that as a result of her depression she has difficulty sleeping and is often fatigued. During the mental status evaluation Dr.

---

[31] Diagnostic and Statistical Manual of Mental Disorders Iv, Text Revision (DSM-IV-TR, 2000).

Honickman noted that Plaintiff had a sad mood but that generally her insight and judgment was good. Dr. Honickman diagnosed Plaintiff with Dysthymic Disorder, DSM IV, 300.40. According to the DSM, the essential feature of Dysthymic Disorder is a chronically depressed mood that occurs for most of the day more days than not for at least 2 years.[32] Moreover, the DSM specifically notes that the symptoms of this disorder include fatigue, loss of concentration and difficulty making decisions.[33] Dr. Honickman's assessment and diagnosis of Plaintiff was made just five months before Plaintiff presented to Marion Citrus Mental Health Center for evaluation at which time Plaintiff was diagnosed with major depressive disorder and had a GAF of 55. Thus, while Dr. Honickman's diagnosis standing alone might not be sufficient to satisfy the fairly low step two threshold, Dr. Honcikman's evaluation in conjunction with the more serious finding of major depressive disorder only five months later should have been more than sufficient to satisfy the rather minimal criteria of step two of the sequential evaluation.[34]

Accordingly, the Court concludes that the ALJ erred at step two of the sequential evaluation by failing to find that Plaintiff's depressive disorder was a severe impairment. By failing to identify this mental impairment at step two, the ALJ then failed to analyze at step four the functional limitations from Plaintiff's mental impairments, if any, and how these limitations impacted her ability to engage in the mental demands of work activities

---

[32] *Id.* at 376-77.

[33] *Id.*

[34] The ALJ apparently recognized this fact in his decision when he stated that "the more recent evidence ... raise the possibility that [Plaintiff's] mental impairment may have recently become more severe." (R. 19.)  Rather than simply discounting this evidence at step two - an admittedly low threshold - the ALJ more properly should have evaluated the medical evidence concerning Plaintiff's depression at step four in evaluating Plaintiff's RFC.

including but not limited to whether fatigue, lack of concentration and the ability to work with others would have effected Plaintiff's ability to engage in work related activities. As such, this case is due to be reversed and remanded so that the ALJ properly can include an evaluation of the functional limitations, if any, of Plaintiff's depressive disorder in the ALJ's RFC evaluation.

### V.  CONCLUSION

In view of the foregoing, it is hereby **ORDERED** that the decision of the Commissioner is **REVERSED and REMANDED** to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion. The Clerk is directed to enter judgment accordingly and close the file.

**IT IS SO ORDERED.**

**DONE AND ORDERED** in Ocala, Florida, on September 30, 2008.

GARY R. JONES
United States Magistrate Judge

Copies to:
All Counsel